Alyssa Koepfgen
Katelyn Kinn
SMITH & LOWNEY, PLLC
2317 East John Street
Seattle, Washington 98112
(206) 860-2883

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

WASTE ACTION PROJECT,                )
                                     )
                Plaintiff,           )
                                     )
v.                                   )
                                     )        COMPLAINT
                                     )
QUIGG BROS., INC.,                   )
                                     )
                Defendant.           )
                                     )
_____    )

## I.    INTRODUCTION

1.      This action is a citizen suit brought under Section 505 of the Clean Water Act

("CWA") as amended, 33 U.S.C. § 1365. Plaintiff, Waste Action Project, seeks declaratory

judgment, injunctive relief, the imposition of civil penalties, and the award of costs, including

attorneys' and expert witnesses' fees, for Defendant Quigg Bros., Inc. ("Quigg"), repeated and

ongoing violations of: (1) the terms and conditions of the National Pollutant Discharge

Elimination System ("NPDES") permit authorizing certain stormwater discharges of pollutants

from its facility in Aberdeen, Washington to navigable waters, and (2) Section 301(a) of the

CWA, 33 U.S.C. § 11(a) for discharging of pollutants, including non-stormwater direct

COMPLAINT - 1

discharges of process wastewater, ballast water, and solid debris, from the over-water area of its facility, where it conducts shipbuilding activities, directly to the Chehalis River, which is a water of the United States, via point source without authorization by a NPDES permit.

## II.     JURISDICTION AND VENUE

2.     The Court has subject matter jurisdiction over Waste Action Project's claims under Section 505(a) of the CWA, 33 U.S.C. § 1365(a). Sections 309(d) and 505(a) and (d) of the CWA, 33 U.S.C. §§ 1319(d) and 1365(a) and (d), authorize the relief Waste Action Project requests.

3.     Under Section 505(b)(1)(A) of the CWA, 33 U.S.C. § 1365(b)(1)(A), Waste Action Project notified Defendant of their violations of the CWA and of Waste Action Project's intent to sue under the CWA by letter dated and postmarked October 7, 2024 ("Notice Letter"). A copy of the Notice Letter is attached to this complaint as Exhibit 1. The allegations in the Notice Letter are incorporated herein by this reference. In accordance with section 505(b)(1)(A) of the CWA, 33 U.S.C. § 1365(b)(1)(A) and 40 C.F.R. § 135.2(a)(1), Waste Action Project notified the Administrator of the United States Environmental Protection Agency ("EPA"), the Administrator of EPA Region 10, and the Director of the Washington Department of Ecology ("Ecology") of its intent to sue Defendant by mailing copies of the Notice Letter to these individuals on October 7, 2024.

4.     At the time of the filing of this Complaint, more than sixty days have passed since the Notice Letter and copies thereof were issued in the manner described in the preceding paragraph.

5.     The violations complained of in the Notice Letter are continuing and/or are reasonably likely to re-occur.

COMPLAINT - 2

Smith & Lowney, pllc
2317 East John Street
Seattle, Washington 98112
(206) 860-2883

6.    At the time of the filing of this Complaint, neither the EPA nor Ecology has commenced any action constituting diligent prosecution to redress the violations alleged in the Notice Letter.

7.    The source of the violations complained of is in Grays Harbor County, Washington, within the Western District of Washington, and venue is therefore appropriate in the Western District of Washington under Section 505(c)(1) of the CWA, 33 U.S.C. § 1365(c)(1), and 28 U.S.C. § 1391(b).

### III.    PARTIES

8.    Waste Action Project is suing on behalf of itself and its members.

9.    Waste Action Project is a non-profit corporation organized under the laws of the state of Washington. Waste Action Project is dedicated to protecting and preserving the environment of Washington State, especially the quality of its waters. Waste Action Project is a membership organization and has at least one member who is injured by Quigg's violations.

10.    Waste Action Project has representational standing to bring this action. Waste Action Project's members are reasonably concerned about the effects of discharges of pollutants, including stormwater from Quigg's facility, and non-stormwater direct discharges of process wastewater, ballast water, and solid debris, from the over-water area of its facility, where it conducts shipbuilding activities, on water quality and aquatic species and wildlife that Waste Action Project's members observe, study, use, and enjoy. Waste Action Project's members are further concerned about the effects of discharges from Quigg's facility on human health. In addition, discharges from Quigg's facility lessen Waste Action Project's members' aesthetic enjoyment of nearby areas. Waste Action Project has members who live, work, fish, and recreate around or use the Chehalis River and Grays Harbor, which are affected by Quigg's discharges.

COMPLAINT - 3

Waste Action Project's members' concerns about the effects of Quigg's discharges are aggravated by Quigg's failure to record and timely report information about its discharges and pollution controls in a timely manner, and by Quigg's failure to obtain and comply with the permit necessary to cover discharges from its shipbuilding activities. The recreational, scientific, economic, aesthetic, and/or health interests of Waste Action Project and its members have been, are being, and will be adversely affected by Quigg's violations of the CWA. The relief sought in this lawsuit can redress the injuries to these interests.

11.    Waste Action Project has organizational standing to bring this action. Waste Action Project has been actively engaged in a variety of educational and advocacy efforts to improve water quality and to address sources of water quality degradation in the waters of Western Washington, including the Chehalis River and Grays Harbor. As detailed herein and in the Notice Letter, Quigg has violated numerous provisions of its NPDES permit including requirements concerning corrective actions, compliance with water quality standards, sampling, Stormwater Pollution Prevention Plan, monitoring, recordkeeping, and permit violation reporting. Quigg has also failed to obtain NDPES permit coverage for its over-water ship building activities, as required by the CWA. As a result, Waste Action Project is deprived of information necessary to properly serve its members by providing information and taking appropriate action to advance its mission. Waste Action Project's efforts to educate and advocate for greater environmental protection, and to ensure the success of environmental restoration projects implemented for the benefit of its members are also obstructed. Finally, Waste Action Project and the public are deprived of information that influences members of the public to become members of Waste Action Project, thereby reducing Waste Action Project's membership numbers. Thus, Waste Action Project's organizational interests have been adversely affected by

COMPLAINT - 4

Smith & Lowney, pllc
2317 East John Street
Seattle, Washington 98112
(206) 860-2883

Quigg's violations. These injuries are fairly traceable to Quigg's violations and are redressable by the Court.

12.     Defendant Quigg is a corporation authorized to conduct business under the laws of the state of Washington.

13.     Defendant owns and operates the heavy construction and water transportation facility located at or about 1021 River Street, Aberdeen, WA 98520 (referred to herein as the "Facility").

### IV.    LEGAL BACKGROUND

14.     Section 301(a) of the CWA, 33 U.S.C. § 1311(a), prohibits the discharge of pollutants by any person, unless in compliance with the provisions of the CWA. A discharge of a pollutant from a point source to waters of the United States without authorization by a NPDES permit, issued under Section 402 of the CWA, 33 U.S.C. § 1342, is prohibited.

15.     The state of Washington has established a federally approved state NPDES program administered by Ecology. Wash. Rev. Code § 90.48.260; Wash. Admin. Code ch. 173-220. This program was approved by the Administrator of the EPA pursuant to Section 402(b) of the CWA, 33 U.S.C. § 1342(b).

16.     Under Section 402 of the CWA, 33 U.S.C. § 1342, Ecology has repeatedly issued iterations of the Industrial Stormwater General Permits, most recently on November 20, 2019, effective January 1, 2020, and set to expire December 31, 2024 (the "2020 ISGP Permit"). The previous permit was issued December 3, 2014, became effective January 2, 2015, and expired December 31, 2019 (the "2015 ISGP Permit"). The 2015 ISGP Permit and 2020 ISGP Permit (collectively, "the Permit"), contain substantially similar requirements and authorize those that obtain coverage thereunder to discharge only stormwater associated with industrial activity, a

COMPLAINT - 5

pollutant under the CWA, and other pollutants contained in the stormwater to waters of the United States subject to certain terms and conditions. Ecology issued the forthcoming permit on December 2, 2024, which will go into effect on January 1, 2025 (the "2025 ISGP"). The terms of the 2025 ISGP are substantially similar to those of the 2015 ISGP and 2020 ISGP, and its terms require implementation of source control and treatment best management practices from the 2015 ISGP and 2020 ISGP. All of the ongoing violations alleged in this Complaint will continue to be ongoing at the time the 2025 ISGP goes into effect.

17.    The Permit imposes certain terms and conditions on those covered thereby, including requirements for monitoring and sampling of discharges, reporting and recordkeeping requirements, and restrictions on the quality of stormwater discharges. To reduce and eliminate pollutants in stormwater discharges, the Permit requires, among other things, that permittees develop and implement best management practices ("BMPs") and a Stormwater Pollution Prevention Plan ("SWPPP"), and apply all known and reasonable methods of prevention, control, and treatment ("AKART") to discharges. The specific terms and conditions of the Permit are described in detail in the Notice Letter, attached hereto as Exhibit 1 and incorporated herein by this reference.

## V.    FACTS

18.    Defendant Quigg operates an industrial facility located at 1021 River St, Aberdeen, WA 98520 (the "Facility") is engaged in industrial activities, including staging for heavy construction work, scrap and waste material storage and processing, material storage and wholesale, and water transportation of freight, along the shoreline of the Chehalis River. The Facility has multiple distinct points of discharge where stormwater and pollutants associated with industrial activity leave the Facility and enter the Chehalis River.

COMPLAINT - 6

19.     Ecology granted Quigg coverage for the Facility under the 2015 ISGP Permit under Permit number WAR003948. Ecology granted subsequent coverage under the 2020 ISGP Permit under the same permit number, WAR003948.

20.     On information and belief, Quigg was contracted by Circle Seafoods to do construction work on a refrigerated storage barge at the facility's dock.

21.     Circle Seafoods operates on a portion of Quigg's facility, including the dock and over-water portion. Quigg and Circle Seafoods have entered into a "Mooring and Yard Lease Agreement."

22.     Circle Seafoods and Quigg have conducted over-water construction work on the refrigerated storage barge which has resulted in direct discharges of non-stormwater, including but not limited to process wastewater, ballast water, and solid debris.

23.     Construction work on the refrigerated storage barge is ongoing.

24.     As the owner of the facility exercising significant control over the activities at the facility, Quigg is liable under the CWA for the violations at the facility alleged in this Complaint.

25.     Quigg has the power and capacity to make timely discovery of discharges at the facility, direct the activities of those who control the mechanisms causing the pollution at the facility, and prevent and abate damage associated with the discharges.

26.     Defendant's ship-building activities and those of its tenant and customer, Circle Seafoods, and the associated discharges are not covered under the Permit. Defendant is therefore operating at this location and discharging industrial pollutants from it without an NPDES permit in violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a). Defendant's unpermitted discharges in violation of 33 U.S.C. 1365(f)(1) and 33 U.S.C. 1311(a) are set forth in section IX of the Notice Letter attached hereto as Exhibit 1 and are incorporate herein by this reference.

COMPLAINT - 7

27.     Defendant has violated and continues to violate the "effluent limitations and standards" as defined by 33 U.S.C. §1365(f), including: (1) by violating its NPDES Permit, 33 U.S.C. § 1365(f)(7), and (2) by discharging without authorization of a NPDES permit, 33 U.S.C. § 1365(f)(1). Defendant's violations of the Permit are set forth in sections I through VIII of the Notice Letter attached hereto as <u>Exhibit 1</u> and are incorporated herein by this reference. In particular, and among the other violations described in the Notice letter, Defendant has violated the Permit by failing to comply with water quality standards, failing to comply with AKART standards, failing to implement BMPs to control water quality, failing to prepare and implement an adequate SWPPP, failing to collect quarterly samples, failing to correctly and timely submit discharge monitoring reports, failing to correctly and timely submit annual reports, failing to comply with visual monitoring requirements, failing to implement applicable corrective actions, failing to record information, failing to retain records, failing to report Permit violations, failing to allow entry and inspection, failing to apply for modification of coverage.

28.     Defendant discharges stormwater from the facility that contains levels of pollutants that exceed the benchmark values established in the Permit, including the days on which Defendant collected samples with the results identified in Table 1, and is likely to continue discharging comparably unacceptable levels of pollutants in stormwater:

Table 1. Benchmark Exceedances

| Quarter in which sample was collected and monitoring point | Copper (benchmark 14 µg/L) |
|---|---|
| 4Q 2019 WSW* | 49.1 |
| 1Q 2020 WSW | 18 |
| 4Q 2022 WSW | 22.4 |

*WSW is a monitoring point designation used and known by Quigg.

COMPLAINT - 8

29.     Defendant's stormwater discharges are causing or contributing to violations of water quality standards and therefore violate Permit Condition S10.A. Discharges from Defendant's facility contribute to the polluted conditions of the waters of the state, including the water quality standards of the Chehalis River and Grays Harbor. Discharges from Defendant's facility contribute to the ecological impacts that result from the pollution of these waters and to Waste Action Project and its members' injuries resulting therefrom. These requirements and Defendant's violations thereof are described in detail in section I.A of the Notice Letter, attached hereto as Exhibit 1, and incorporated herein by this reference.

30.     Defendant's elevated levels of copper and other pollutants, lack of BMPs, and failure to perform corrective actions all indicate that Defendant is failing to apply AKART to its discharges and is failing to implement an adequate SWPPP and BMPs. Defendant violated and continue to violate Permit Conditions S10 and S3 by not developing, modifying, and/or implementing BMPs in accordance with the requirements of the Permit, and/or by not applying AKART to discharges from the facility. These requirements and Defendant's violations thereof are described in detail in section I.B and section II of the Notice Letter, attached as Exhibit 1, and incorporated herein by this reference.

31.     Defendant has violated and continues to violate the monitoring requirements of the Permit, Conditions S3, S4, S7, and S9. Defendant has failed to sample its stormwater discharges once during every calendar quarter at each distinct point of discharge offsite except for substantially identical outfalls. Defendant has failed to collect and analyze stormwater samples from its dock, among other locations. Defendant has failed to correctly and timely submit discharge monitoring reports required by Condition S9.B of the Permit. Defendant has failed to timely submit compliant Annual Reports as required by Condition S9.B of the Permit.

COMPLAINT - 9

Defendant has failed to comply with visual monitoring requirements required by Permit Condition S7 by failing to conduct Industrial Stormwater Monthly Inspection Reports by qualified personnel each and every month for the last five years. Defendant's violations of the Permit's monitoring requirement are described in section III of the Notice Letter, attached hereto as <u>Exhibit 1</u>, and incorporated herein by this reference. All these violations are reasonably likely to recur.

32.     Defendant has failed to implement source control or treatment BMPs as required by Condition S8.A of the Permit. Defendant has failed to comply with Level One Corrective Action requirements as required by Condition S8.B of the Permit, including for the total copper exceedances reflected in Table 1 above. These requirements and Defendant's violations thereof are described in section IV.A and IV.B of the Notice Letter, attached hereto as <u>Exhibit 1</u>, and are incorporated herein by this reference. These violations are reasonably likely to recur.

33.     Defendant has violated and continues to violate the recordkeeping requirements of Permit Condition S4.B. Defendant does not record and retain specified information for each stormwater sample taken, including the sample date and time, a notation describing if Defendant collected the sample within the first 12 hours of stormwater discharge event, an explanation of why Defendant could not collect a sample within the first 12 hours of a stormwater discharge event, the sample location, method of sampling and of preservation, and the individual performing the sampling, as required by the Permit Condition. These requirements and Defendant's violations thereof are described in section V.A of the Notice Letter, attached hereto as <u>Exhibit 1</u>, and are incorporated herein by this reference. These violations are reasonably likely to recur.

COMPLAINT - 10

34.     Defendant has violated and continues to violate the recordkeeping requirements of 2015 ISGP Permit Condition S9.C, and 2020 Permit Condition S9.D. Defendant does not retain for a minimum of five years a copy of the current Permit, a copy of Defendant's coverage letter, records of all sampling information, inspection reports including required documentation, any other documentation of compliance with permit requirements, all equipment calibration records, all BMP maintenance records, all original recordings for continuous sampling instrumentation, copies of all laboratory results, copies of all required reports, and records of all data used to complete the application for the Permit, as required by the Permit Conditions. These requirements and Defendant's violations thereof are described in section V.B of the Notice Letter, attached hereto as Exhibit 1, and are incorporated herein by this reference. These violations are reasonably likely to recur.

35.     Conditions S9.E of the 2015 ISGP Permit and S9.F of the 2020 ISGP Permit require Defendant to take certain actions, including reporting to Ecology, in the event Defendant is unable to comply with any terms and conditions of the Permit which may endanger human health or the environment. Defendant has failed to comply with these requirements of the Permit by failing to report and subsequently correct permit violations, including each and every time Defendant failed to sample a stormwater discharge as described above in paragraph 31, and each and every time Defendant failed to comply with a corrective action requirement as described above in paragraph 32. These requirements and Defendant's violations thereof are described in section VI of the Notice Letter, attached hereto as Exhibit 1, and are incorporated herein by this reference. These violations are reasonably likely to recur.

36.     Condition G3 of the Permit requires Defendant to allow authorized representatives of Ecology to enter its premises, to gain access to records, to inspect the facility,

COMPLAINT - 11

and to sample substances for the purposes of assuring permit compliance. Defendant has violated these requirements by repeatedly denying Ecology entry and inspection. These requirements and Defendant's violations thereof are described in section VII of the Notice Letter, attached hereto as Exhibit 1, and are incorporated herein by this reference. These violations are reasonably likely to recur.

37.    Condition S2.B of the Permit requires Defendant to submit a Modification of Coverage Form to Ecology when it anticipates a significant process change. Condition G19 of the Permit requires Defendant to give Ecology notice of a significant process change. Defendant failed to comply with these requirements when it initiated marine construction and ship building activities without submitting a Modification of Coverage Form or providing Ecology with notice. These requirements and Defendant's violations thereof are described in section VIII of the Notice Letter, attached hereto as Exhibit 1, and are incorporated herein by this reference. These violations are reasonably likely to recur.

38.    A significant penalty should be imposed against Defendant under the penalty factors set forth in 33 U.S.C. § 1319(d).

39.    Defendant's violations were avoidable had Defendant been diligent in overseeing facility operations and maintenance.

40.    Defendant benefitted economically as a consequence of its violations and failure to implement improvements at the facility.

41.    Defendant's violations caused and contributed to pollution in the water column and sediments of the receiving water, which may be ameliorated by an order from the Court requiring clean up or monitoring.

COMPLAINT - 12

## VI.    FIRST CAUSE OF ACTION: PERMIT VIOLATIONS

42.    The preceding paragraphs and the allegations in the Notice Letter attached hereto as Exhibit 1 are incorporated herein.

43.    Defendant's violations of the Permit described herein and in the Notice Letter constitute violations of sections 301 of the Clean Water Act, 33 U.S.C. §§ 1311, and violations of "effluent standard(s) or limitation(s)" as defined by section 505, 33 U.S.C. § 1365.

44.    No agency has taken an enforcement action constitution diligent prosecution or otherwise precluding claims under 33 U.S.C. §§ 1319 or 1365(a).

45.    Prior notice of violations and claims was provided to Defendant and others as required.

46.    These violations committed by Defendant are ongoing or are reasonably likely to continue to occur. Any and all additional violations of the Permit and the CWA which occur after those described in Waste Action Project's Notice Letter, but before a final decision in this action, should be considered ongoing violations subject to this Complaint.

47.    Without the imposition of appropriate civil penalties and the issuance of an injunction, Defendant is likely to continue to violate the Permit and the CWA to the further injury of Waste Action Project, its members, and others.

## VII.    SECOND CAUSE OF ACTION: UNPERMITTED DISCHARGE

48.    The preceding paragraphs and the allegations in the Notice Letter attached hereto as Exhibit 1 are incorporated herein.

49.    By discharging non-stormwater from the over-water portion of the Facility where it conducts shipbuilding activities, Defendant is violating section 301(a) of the CWA, 33 U.S.C.

COMPLAINT - 13

Smith & Lowney, pllc
2317 East John Street
Seattle, Washington 98112
(206) 860-2883

§ 1311(a). This constitutes a violation of an "effluent standards or limitations" under the CWA per 33 U.S.C. § 1365(f)(1).

50.     No agency has taken an enforcement action constitution diligent prosecution or otherwise precluding claims under 33 U.S.C. §§ 1319 or 1365(a).

51.     Prior notice of violations and claims was provided to Defendant and others as required.

52.     These violations committed by Defendant are ongoing or are reasonably likely to continue to occur. Any and all additional violations of the CWA which occur after those described in Waste Action Project's Notice Letter, but before a final decision in this action, should be considered ongoing violations subject to this Complaint.

53.     Without the imposition of appropriate civil penalties and the issuance of an injunction, Defendant is likely to continue to violate the CWA to the further injury of Waste Action Project, its members, and others.

## VIII.   RELIEF REQUESTED

Wherefore, Waste Action Project respectfully requests that this Court grant the following relief:

A.     Issue a declaratory judgment that Defendant has violated and continues to be in violation of the Permit and the CWA

B.     Enjoin Defendant from operating the facility in a manner that results in further violations of the Permit and the CWA;

C.     Order Defendant to cease shipbuilding activities until it applies for and receives an NPDES permit for shipbuilding activities.

COMPLAINT - 14

D.      Order Defendant to immediately implement a SWPPP that complies with the 2025 ISGP Permit at the facility;

E.      Order Defendant to allow Waste Action Project to participate in the development and implementation of Defendant's SWPPP and compliance plan;

F.      Order Defendant to provide Waste Action Project, for a period beginning on the date of the Court's Order and running for three years after Defendant achieves compliance with all of the conditions of the Permit, with copies of all reports and other documents which Defendant submits to Ecology regarding Defendant's coverage under the Permit at the facility at the time these documents are submitted;

G.      Order Defendant to take specific actions to remediate the environmental harm caused by its violations;

H.      Order Defendant to pay civil penalties of $66,712 per day of violation for each violation committed by Defendant, pursuant to Sections 309(d) and 505(a) of the CWA, 33 U.S.C. §§ 1319(d) and 1365(a), and 40 C.F.R. § 19 and 19.4;

I.      Award Waste Action Project its litigation expenses, including reasonable attorneys' and expert witness fees, as authorized by Section 505(d) of the CWA, 33 U.S.C. § 1365(d), and any other applicable authorization; and

J.      Award such other relief as this Court deems appropriate.


RESPECTFULLY SUBMITTED this 11th day of December, 2024.


Smith & Lowney, PLLC

By:     *s/Alyssa Koepfgen*
        Alyssa Koepfgen, WSBA #46773
        *s/Katelyn Kinn*
        Katelyn Kinn, WSBA #42686

COMPLAINT - 15

Attorneys for Plaintiff
2317 E. John St.,
Seattle, WA 98112
Tel: (206) 860-2124
Fax: (206) 860-4187
E-mail: alyssa@smithandlowney.com
katelyn@smithandlowney.com

COMPLAINT - 16

# Exhibit 1

# SMITH & LOWNEY
PLLC
## ATTORNEYS AT LAW

October 7, 2024

**Via Certified Mail - Return Receipt Requested**

Managing Agent
Quigg Bros., Inc.
1021 River St
Aberdeen, WA 98520

Quigg Bros., Inc.
819 W. State St.
PO Box 1707
Aberdeen, WA 98520-5934

Re:    **NOTICE OF INTENT TO SUE UNDER THE CLEAN WATER ACT AND
REQUEST FOR COPY OF STORMWATER POLLUTION PREVENTION PLAN**

Dear Managing Agent:

We represent Waste Action Project ("WAP"), P.O. Box 9281, Covington, WA 98042, (206) 849-5927. Any response or correspondence related to this matter should be directed to us at the letterhead address (2317 E John St, Seattle, WA 98112). This letter is to provide you with sixty days' notice of WAP's intent to file a citizen suit against Quigg Bros., Inc. ("Quigg"), under section 505 of the Clean Water Act ("CWA"), 33 U.S.C. § 1365, for the violations described below. This letter is also a request for a copy of the complete and current stormwater pollution prevention plan ("SWPPP") required by Quigg's National Pollution Discharge Elimination System ("NPDES") permit.

Quigg was granted coverage under the Industrial Stormwater General Permit ("ISGP") issued by the Washington Department of Ecology ("Ecology") effective September 20, 2002 under permit number S03003948. Ecology granted Quigg coverage under the next iteration of the ISGP effective January 1, 2010 under NPDES No. WAR003948, and has since granted Quigg coverage under each successive iteration of the ISGP under the same permit number, WAR003948, including the ISGP effective January 1, 2015 (the "2015 Permit") and the ISGP effective January 1, 2020, at set to expire on December 31, 2024 (the "2020 Permit").



Quigg has violated and continues to violate effluent standards and limitations under the CWA (see 33 U.S.C. § 1365(f)) including the terms and conditions of the Permit with respect to operations of, and discharges of stormwater and pollutants from its facility located at or about 1021 River Street, Aberdeen, Washington 98520 (the "facility") as described herein, to the Chehalis River. The facility subject to this notice includes any contiguous or adjacent properties owned or operated by Quigg.

## I.    COMPLIANCE WITH APPLICABLE STANDARDS

### A. Compliance with Water Quality Standards

Condition S10.A of the Permits prohibits discharges that cause or contribute to violations of water quality standards. Water quality standards are the foundation of the CWA and Washington's efforts to protect clean water. In particular, water quality standards represent the U.S. Environmental Protection Agency ("EPA") and Ecology's determination, based on scientific studies, of the thresholds at which pollution starts to cause significant adverse effects on fish or other beneficial uses. For each water body in Washington, Ecology designates the "beneficial uses" that must be protected through the adoption of water quality standards.

A discharger must comply with both narrative and numeric criteria water quality standards. WAC 173-201A-010; WAC 173-201A-510 ("No waste discharge permit can be issued that causes or contributes to a violation of water quality criteria, except as provided for in this chapter."). Narrative water quality standards provide legal mandates that supplement the numeric criteria. Furthermore, the narrative water quality standard applies with equal force even if Ecology has established a numeric water quality standard. Specifically, Condition S10.A of the Permits requires that Quigg's discharges not cause or contribute to an excursion of Washington State water quality standards.

Quigg discharges to the Chehalis River. Quigg discharges stormwater that contains elevated levels of copper as indicated in discharge monitoring data reported under the Permit, as indicated in the table of benchmark excursions below. These discharges cause and/or contribute to violations of water quality standards for copper in the Chehalis River and have occurred each and every day during the last five years on which there was 0.1 inch or more of precipitation, and continue to occur. *See* WASH. ADMIN. CODE §§ 173-201A-200 (fresh water designated uses and criteria), (1)(a)(b) (general criteria that  apply to all aquatic life fresh water uses), 2(a) (general criteria applicable to fresh water recreational uses), (4) (miscellaneous uses including wildlife habitat, harvesting commerce and navigation, boating, and aesthetics general criteria); § 173-201A-240 (toxic  substances criteria for copper), 173-201A-260 (natural conditions and other water  quality criteria and applications), 173-201A-600 (use designations – fresh waters); 173-201A-602 (use designations for the Chehalis River including aquatic life use: spawning/rearing; recreation use: primary contact; water supply uses: domestic, industrial, agricultural, and stock water; miscellaneous uses: wildlife habitat, harvesting, commerce/navigation, boating, aesthetics).

2

**Table 1. Benchmark Exceedances**

| Quarter in which sample was collected and monitoring point | Copper (benchmark 14 µg/L) |
|---|---|
| 4Q 2019 WSW* | 49.1 |
| 1Q 2020 WSW | 18 |
| 4Q 2022 WSW | 22.4 |

*WSW is a monitoring point designation used and known by Quigg

Moreover, the discharges Quigg has sampled and reported underrepresent the polluted condition of its facility discharges, as explained below.

### B.     Compliance with AKART Standards

Condition S10.C of the Permits requires Quigg to apply all known and reasonable methods of prevention, control, and treatment ("AKART") to all discharges, including preparation and implementation of an adequate SWPPP and best management practices ("BMPs"). Quigg has violated and continues to violate these conditions by failing to apply AKART to its discharges or to implement an adequate SWPPP and BMPs as evidenced by the elevated levels of pollutants in its discharge as described below in this Notice of Intent to Sue.

Condition S1.A of the Permits requires that all discharges and activities authorized be consistent with the terms and conditions of the Permit. Quigg has violated these conditions by discharging and acting inconsistent with the conditions of the Permit as described in this Notice of Intent to Sue.

## II.     STORMWATER POLLUTION PREVENTION PLAN VIOLATIONS

Quigg is in violation of the Permit's SWPPP provisions as follows:

1. Condition S3.A of the Permits requires Quigg to develop and implement a SWPPP that contains specified components. Condition S3.A.2 of the 2015 Permit and S3.A.1 of the 2020 Permit require the SWPPP to specify BMPs necessary to provide AKART and ensure that discharges do not cause or contribute to violations of water quality standards. Quigg has violated these requirements of the Permit each and every day for the last five years and continues to violate them as it has failed to prepare and/or implement a SWPPP that includes AKART BMPs and BMPs necessary to comply with state water quality standards.

2. Condition S3.A of the Permits requires Quigg to have and implement a SWPPP that is consistent with permit requirements, fully implemented as directed by permit conditions, and

updated as necessary to maintain compliance with permit conditions. Quigg has violated these requirements of the Permit each and every day for the last five years and continues to violate them because its SWPPP is not consistent with permit requirements, has not been fully implemented, and has not been updated as necessary, including correcting any deficiencies within 30 days of notice.

3. The SWPPP fails to satisfy the requirements of Condition S3 of the Permits because it does not adequately describe BMPs. Condition S3.B.4 of the Permits requires that the SWPPP include a description of the BMPs that are necessary for the facility to eliminate or reduce the potential to contaminate stormwater. Condition S3.A.3 of the 2015 Permit and S3.A.2 of the 2020 Permit require that the SWPPP include BMPs consistent with approved stormwater technical manuals or document how stormwater BMPs included in the SWPPP are demonstratively equivalent to the practices contained in the approved stormwater technical manuals, including the proper selection, implementation, and maintenance of all applicable and appropriate BMPs. *See Stormwater Management Manual for Western Washington*, July 2019, https://fortress.wa.gov/ecy/ezshare/wq/Permits/Flare/2019SWMMWW/Content/Resources/Docs ForDownload/2019SWMMWW.pdf. Quigg 's SWPPP does not comply with these requirements because it does not adequately describe BMPs and does not include BMPs consistent with approved stormwater technical manuals nor does it include BMPs that are demonstratively equivalent to such BMPs with documentation of BMP adequacy.

4. Quigg 's SWPPP fails to satisfy the requirements of Condition S3.B.2 of the Permits because it fails to include a facility assessment as mandated. The SWPPP fails to include an adequate facility assessment because it does not describe the industrial activities conducted at the entire site, the general layout of the entire facility including buildings and storage of raw materials, the flow of goods and materials through the entire facility as required.

5. Quigg 's SWPPP fails to satisfy the requirements of Condition S3.B.1 of the Permits because it does not include a site map that identifies significant features, the stormwater drainage and discharge structures, the stormwater drainage areas for each stormwater discharge point off-site, a unique identifying number for each discharge point, each sampling location with a unique identifying number, paved areas and buildings, areas of pollutant contact associated with specific industrial activities, conditionally approved non-stormwater discharges, surface water locations, areas of existing and potential soil erosion, vehicle maintenance areas, and lands and waters adjacent to the site that may be helpful in identifying discharge points or drainage routes.

6. Quigg 's SWPPP fails to comply with Condition S3.B.2.b of the Permits because it does not include an inventory of industrial activities that identifies all areas associated with industrial activities that have been or may potentially be sources of pollutants as required. The SWPPP does not identify all areas associated with loading and unloading of dry bulk materials or liquids, outdoor storage of materials or products, outdoor manufacturing and processing, onsite dust or particulate generating processes, on-site waste treatment, storage, or disposal, vehicle and equipment fueling, maintenance, and/or cleaning, roofs or other surfaces exposed to air emissions from a manufacturing building or a process area, and roofs or other surfaces composed of materials that may be mobilized by stormwater as required by these conditions.

7. Quigg 's SWPPP does not comply with Condition S3.B.2.c of the Permits because it does not include an adequate inventory of materials. The SWPPP does not include an inventory of materials that lists the types of materials handled at the site that potentially may be exposed to precipitation or runoff and that could result in stormwater pollution, a short narrative for material describing the potential for the pollutants to be present in stormwater discharge that is updated when data becomes available to verify the presence or absence of the pollutants, a narrative description of any potential sources of pollutants from past activities, materials and spills that were previously handled, treated, stored, or disposed of in a manner to allow ongoing exposure to stormwater as required. The SWPPP does not include the method and location of on-site storage or disposal of such materials and a list of significant spills and significant leaks of toxic or hazardous pollutants as these permit conditions require.

8. Condition S3.B.4 of the Permits requires that permittees include in their SWPPPs and implement mandatory BMPs. Quigg is in violation of this requirement because it has failed to include in its SWPPP and implement the mandatory BMPs of the Per

9. Quigg 's SWPPP does not comply with Condition S3.B.4.b.i of the Permits because it does not include and implement required operational source control BMPs. Quigg fails to include operation source control BMPs in the following categories: good housekeeping (including the definition of ongoing maintenance and cleanup of areas that may contribute pollutants to stormwater discharges, and a schedule/frequency for each housekeeping task); preventive maintenance (including BMPs to inspect and maintain stormwater drainage, source controls, treatment systems, and plant equipment and systems, and the schedule/frequency for each task); spill prevention and emergency cleanup plan (including BMPs to prevent spills that can contaminate stormwater, for material handling procedures, storage requirements, cleanup equipment and procedures, and spill logs); employee training (including an overview of what is in the SWPPP, how employees make a difference in complying with the SWPPP, spill response procedures, good housekeeping, maintenance requirements, and material management practices, how training will be conducted, the frequency/schedule of training, and a log of the dates on which specific employees received training); inspections and recordkeeping (including documentation of procedures to ensure compliance with permit requirements for inspections and recordkeeping, identification of personnel who conduct inspections, provision of a tracking or follow-up procedure to ensure that a report is prepared and appropriate action taken in response to visual monitoring, definition of how Quigg will comply with signature and record retention requirements, and certification of compliance with the SWPPP and Permit).

10. Quigg's SWPPP does not comply with Condition S3.B.4.b.i.7 of the Permits because it does not include measures to identify and eliminate the discharge of process wastewater, domestic wastewater, noncontact cooling water, and other illicit discharges to stormwater sewers, or to surface waters and ground waters of the state.

11. Quigg 's SWPPP does not comply with Condition S3.B.4.b.ii of the Permits because it does not include required structural source control BMPs to minimize the exposure of manufacturing, processing, and material storage areas to rain, snow, snowmelt, and runoff.

12. Quigg 's SWPPP does not comply with Condition S3.B.4.b.iii of the Permits because it does not include treatment BMPs as required.

13. Quigg 's SWPPP fails to comply with Condition S3.B.4.b.v of the Permits because it does not include BMPs to prevent the erosion of soils or other earthen materials and prevent off-site sedimentation and violations of water quality standards.

14. Quigg 's SWPPP fails to satisfy the requirements of Condition S3.B.5 of the Permits because it fails to include a stormwater sampling plan as required. The SWPPP does not include a sampling plan that: identifies points of discharge to surface waters, storm sewers, or discrete ground water infiltration locations; documents why each discharge point is not sampled; identifies each sampling point by its unique identifying number; identifies staff responsible for conducting stormwater sampling; specifies procedures for sampling collection and handling; specifies procedures for sending samples to the a laboratory; identifies parameters for analysis, holding times and preservatives, laboratory quantization levels, and analytical methods; and specifies the procedure for submitting the results to Ecology.

## III.    MONITORING AND REPORTING VIOLATIONS

### A.    Failure to Collect Quarterly Samples

Condition S4.B of the Permits requires Quigg to collect a sample of its stormwater discharge once during every calendar quarter.

Quigg violated this requirement by failing to collect stormwater samples from any of its monitoring points during the second quarter of 2020, the third quarter of 2021, the first, second, and third quarters of 2022, the second and third quarters of 2023, and the first and second quarters of 2024. Quigg also violated this requirement by failing to collect stormwater samples from monitoring point XSW during the fourth quarter of 2019. Quigg also violated this requirement by failing to collect stormwater samples from monitoring points WSW, USW, and ZSW during the third quarter of 2019.

Additionally, Conditions S3.B.2.c of the 2015 Permit and S4.B.3.a of the 2020 Permit require Quigg to collect stormwater samples at each distinct point of discharge offsite except for substantially identical outfalls, in which case only one of the substantially identical outfalls must be sampled. These conditions set forth sample collection criteria but require the collection of a sample even if the criteria cannot be met. Quigg has multiple distinct points of discharge where stormwater is leaving the facility that it is not sampling and analyzing appropriately, including but not limited to the facility's dock. Quigg is in violation of these conditions of the Permit by failing to collect and analyze samples from each distinct point of discharge during every quarter for the last five years. These violations will continue until Quigg commences proper monitoring all distinct points of discharge.

**B.      Failure to Correctly and Timely Submit Discharge Monitoring Reports**

Condition S9.B of the Permits requires Quigg to use DMR forms provided or approved by Ecology to summarize, report and submit monitoring data to Ecology. For each monitoring period (calendar quarter) a DMR must be completed and submitted to Ecology not later than 45 days after the end of the monitoring period.

Quigg has violated these conditions by failing to submit a DMR within the time prescribed for the second quarter of 2020, the third quarter of 2021, the first, second, and third quarters of 2022, the second and third quarters of 2023, and the first and second quarters of 2024.

**C.      Violations of the Annual Report Requirements**

Condition S9.B of the 2015 Permit and Condition S9.C of the 2020 Permit require Quigg to submit a complete and accurate Annual Report to Ecology no later than May 15th of each year. The Annual Report must include corrective action documentation as required in Condition S8.B–D of the Permits. If a corrective action is not yet completed at the time of submission of the Annual Report, Quigg must describe the status of any outstanding corrective action. Specific information to be included in the Annual Report is identification of the conditions triggering the need for corrective action, description of the problem and identification of dates discovered, summary of any Level One, Two, or Three Corrective Actions completed during the previous calendar year, including the dates corrective actions completed, and description of the status of any Level 2 or 3 Corrective Actions triggered during the previous calendar year, including identification of the date Quigg expects to complete corrective actions.

Quigg has violated and continues to violate these conditions by submitting its 2019 Annual Report and its 2020 Annual Report late. Quigg has also violated and continues to violation these conditions by failing to submit a 2021 Annual Report and failing to submit a 2023 Annual Report.

**D.      Failure to Comply with Visual Monitoring Requirements**

Condition S7.A of the Permits requires that a monthly visual inspection be conducted at the facility by qualified personnel. Condition S7.B of the Permits requires each inspection to include observations made at stormwater sampling locations and areas where stormwater associated with industrial activity is discharged; observations for the presence of floating materials, visible oil sheen, discoloration, turbidity, odor, etc. in the stormwater discharges; observations for the presence of illicit discharges; a verification that the descriptions of potential pollutant sources required by the permit are accurate; a verification that the site map in the SWPPP reflects current conditions; and an assessment of all BMPs that have been implemented (noting the effectiveness of the BMPs inspected, the locations of BMPs that need maintenance, the reason maintenance is needed and a schedule for maintenance, and locations where additional or different BMPs are needed). Quigg has violated and continues to violate these requirements because, for the last five years, it has failed to conduct each of the requisite visual monitoring and inspections each and every month.

7

Condition S7.C of the Permits requires that Quigg record the results of each inspection in an inspection report or checklist that is maintained on-site and documents the observations, verifications, and assessments required. The report/checklist must include the time and date of the inspection; the locations inspected; a statement that, in the judgment of the person conducting the inspection and the responsible corporate officer, the facility is either in compliance or out of compliance with the SWPPP and the Permit; a summary report and schedule of implementation of the remedial actions Quigg plans to take if the site inspection indicates that the facility is out of compliance; the name, title, signature and certification of the person conducting the facility inspection; and a certification and signature of the responsible corporate officer or a duly authorized representative. Quigg is in violation of these requirements because, for the last five years, it failed to prepare and maintain the requisite inspection reports or checklists and failed to make the requisite certifications and summaries.

## IV.    CORRECTIVE ACTION VIOLATIONS

### A.    Violations of the Implementation of Source Control and Treatment BMPs

Condition S8.A of the Permits require Quigg to implement any applicable Level One Corrective Actions, Level Two Corrective Actions, or Level Three Corrective Actions or Responses required by the previous Industrial Stormwater General Permit(s). Quigg is required to continue to operate and/or maintain any source control or treatment BMPs related to Level One Corrective Actions, Level Two Corrective Actions, or Level Three Corrective Actions or responses implemented prior to the effective date of this permit. Quigg has failed and continues to fail to operate and/or maintain source control or treatment BMPs.

### B.    Violations of the Level One Requirements

Condition S8.B of the Permits require Quigg take specified actions, called a "Level One Corrective Action," each time quarterly stormwater sample results exceed a benchmark value or are outside the benchmark range. Condition S5.A Table 2, Condition S5.A Table 3, and Condition S6 Table 7 of the Permit establishes the following benchmarks applicable to Quigg: turbidity 25 NTU; pH 5–9 SU; no visible oil sheen; total copper 14 µg/L; total zinc 117 µg/L; total lead 81.6 µg/L; NWTPHDx 10 mg/L.

As described by Condition S8.B of the Permit, a Level One Corrective Action requires that within 14 days of receipt of sampling results that indicate a benchmark exceedance during a given quarter; or, for parameters other than pH or visible oils sheen, the end of the quarter, whichever is later, Quigg shall: (1) conduct an inspection to investigate the cause; (2) review the SWPPP for the facility and ensure that it fully complies with Condition S3 of the Permit and contains the correct BMPs from the applicable Stormwater Management Manual; (3) make appropriate revisions to the SWPPP to include additional operational source control BMPs with the goal of achieving the applicable benchmark values in future discharges; (4) summarize the Level One Corrective Action in the Annual Report required under Condition S9.B of the Permit; and (5) and sign, certify, and fully implement the revised SWPPP in accordance with Condition S3 of the Permit and the applicable stormwater management manual as soon as possible, and no later than the DMR due date for the quarter the benchmark was exceeded.

8

Quigg is in violation of the Level One Corrective Action requirements in the Permits for failing to implement a Level One Corrective Action within 14 days of receipt or the end of the quarter for its total copper exceedances reflected in Table 1 above (fourth quarter 2019, first quarter 2020, and fourth quarter 2022).

Quigg's failures to comply with the Level One Corrective Action requirements include the failure to conduct an inspection to investigate the cause; perform the required review; revision and certification of the SWPPP; perform required implementation of additional BMPs; complete an adequate summarization in the Annual Report; and sign, certify, and fully implement the revised SWPPP in accordance with Condition S3 of the Permit each and every time, during the last five years, when its quarterly stormwater sampling results were greater than a benchmark or outside the benchmark range.

## V.    VIOLATIONS OF THE RECORDKEEPING REQUIREMENTS

### A.    Failure to Record Information

Condition S4.B.3 of the Permits requires Quigg to record and retain specified information for each stormwater sample taken, including the sample date and time, a notation describing if Quigg collected the sample within the first 12 hours of stormwater discharge event, an explanation of Quigg could not collect a sample within the first 12 hours of a stormwater discharge event, the sample location, method of sampling and of preservation, and the individual performing the sampling. Quigg is in violation of these conditions as it has not recorded each of these specified items for each sample taken during the last five years.

### B.    Failure to Retain Records

Condition S9.C of the 2015 Permit and S9.D of the 2020 Permit require Quigg to retain for a minimum of five years a copy of the current Permit, a copy of Quigg 's coverage letter, records of all sampling information, inspection reports including required documentation, any other documentation of compliance with permit requirements, all equipment calibration records, all BMP maintenance records, all original recordings for continuous sampling instrumentation, copies of all laboratory results, copies of all required reports, and records of all data used to complete the application for the Permit. Quigg is in violation of these conditions because it has failed to retain records of such information, reports, and other documentation for the last five years.

## VI.    FAILURE TO REPORT PERMIT VIOLATIONS

Condition S9.E of the 2015 Permit and S9.F of the 2020 Permit require Quigg to take certain actions in the event it is unable to comply with any of the terms and conditions of the Permit which may endanger human health or the environment or exceed any numeric effluent limitation in the permit. In such circumstances, Quigg must immediately take action to minimize potential pollution or otherwise stop the noncompliance and correct the problem, and Quigg must immediately notify the appropriate Ecology regional office of the failure to comply. Quigg must

then submit a detailed written report to Ecology, including specified details, within 5 days of the time Quigg became aware of the circumstances unless Ecology requests an earlier submission.

Quigg routinely violates these requirements, including each and every time it failed to comply with the corrective action requirements described in section IV of this Notice of Intent to Sue, and each and every time Quigg discharged stormwater with concentrations of pollutants in excess of the Permit's copper benchmark, as described in section I.A above. All these violations may endanger human health or the environment.

## VII.    VIOLATIONS OF THE RIGHT OF ENTRY AND INSPECTION

Condition G3 of the Permits require Quigg to allow an authorized representative of Ecology to enter its premises, to gain access to records, to inspect the facility, equipment, practices, methods, and operations, and to sample substances or parameters for purposes of assuring permit compliance.

Quigg has violated these requirements by repeatedly denying Ecology entry and inspection including but not limited to the following dates: August 3, 2023, August 22, 2023, December 13, 2023, and February 22, 2024.

## VIII.    MODIFICATION OF PERMIT COVERAGE VIOLATIONS.

Condition S2.B of the Permits requires Quigg to submit a complete Modification of Coverage Form to Ecology when Quigg anticipates a significant process change. This application for modification must be submitted at least 60 days prior to implementing a significant process change. Quigg must complete the public notice requirements in WAC 173-226-130(5) as part a complete application for modification of coverage. And Quigg must comply with the State Environmental Protection Act (SEPA) as part of a complete application for modification of coverage if undergoing a significant process change. Furthermore, general condition G19 requires Quigg to, as soon as possible, give notice to Ecology of planned physical alterations, modification or additions to the permitted industrial activity, which will result in a significant process change. A "significant process change" is defined in the Permits at Appendix 2 as "any modification of the facility that would result in any of the following: (1) Add different pollutants in a significant amount to the discharge, (2) Increase the pollutants in the stormwater discharge by a significant amount, (3) Add a new industrial activity (SIC) that was not previously covered, (4) Add additional impervious surface or acreage such that stormwater discharge would be increased by 25% or more."

Quigg violated condition S2.B and G19 of the Permits by failing to apply for a Modification of Coverage for a significant process change, including a failure to comply with the public notice requirements and SEPA compliance requirements. The significant process change at this facility was the initiation of marine construction activity or ship building activity. Quigg was required to apply for a Modification of Permit coverage for this process change because the ship building could add different pollutants in a significant amount to the discharge or increase the pollutants in the discharge by a significant amount. Furthermore, ship building is a new industrial activity with a different SIC and NAICS code that was not previously covered. The

10

NAICS code for ship building and repairing is 336611 (SIC 3731). Currently, the only NAICS codes associated with the facility are for heavy construction, deep sea foreign transportation of freight, scrap and waste materials, and highway, street, and bridge construction (SIC codes 1629, 4412, 5093, and NAICS code 237310, respectively).

## IX.    UNPERMITTED DISCHARGES

The CWA, 33 U.S.C. §§ 1311(a), prohibits the discharge of pollutants, including stormwater associated with industrial activity, to waters of the United States, except as authorized by a NPDES permit. The Permits authorize only the discharges of stormwater and pollutants contained in stormwater.

Quigg has been engaged in ship building activities at its dock since at least April 27, 2024. As documented in Ecology's inspection report, on July 24, 2024, Ecology Inspector Adonia McKinzi observed and documented "unpermitted ship building activity." The report explains that "Ocean Protein contracted with Quigg Brothers to build their floating freezer" and states that Quigg was in the process of ship building activity involving fabricated steel beams and white insulating panels. The report notes that the inspector observed "metal fabrication activity on a barge moored in water at the Quigg dock on the north bank of the Chehalis River." Ecology's July 24, 2024 inspection report details that Ecology subsequently received a report accompanied by a photograph evidencing that the marine vessel construction activity was ongoing as of August 12, 2024. Similar evidence confirms that the same activity was still ongoing as of August 21, 2024, and September 9, 2024. On September 10, 2024, Ecology Inspectors again observed and documented ongoing marine vessel construction activity firsthand.

Quigg's ship building activity or marine vessel construction activity discharges pollutants, including non-stormwater direct discharges of process wastewater, ballast water, and solid debris, from the over-water area of its facility directly to the Chehalis River, which is a water of the United States. Quigg's ship building activities and all associated pollutant discharges are not covered or permitted by the only NPDES permit for which its facility has coverage, the ISGP.

Quigg has therefore violated and continues to violate Section 301(a) of the CWA, 33 U.S.C. § 1311(a), by discharging pollutants from its facility to waters of the United States without an applicable NPDES permit. The facility subject to this section of this notice includes any contiguous or adjacent properties operated by Quigg. Quigg's unpermitted discharges have occurred each and every day since the vessel construction activity began and are ongoing because they continue or are likely to recur. The violations alleged in this notice of intent to sue will continue until Quigg obtains and comes into compliance with a NPDES permit authorizing such discharges.

## X.    REQUEST FOR SWPPP

Pursuant to Condition S9.G of the 2020 Permit, WAP hereby requests that Quigg provide a copy of, or access to, its current SWPPP complete with all incorporated plans, monitoring reports, checklists, and training and inspection logs. The copy of the SWPPP and any other

communications about this request should be directed to the undersigned at the letterhead address.

Should Quigg fail to provide the requested complete copy of, or access to, its SWPPP as required by Condition S9.G of the 2020 Permit, it will be in violation of that condition, which violation shall also be subject to this Notice of Intent to Sue and any ensuing lawsuit.

## XI.    CONCLUSION

The above-described violations reflect those indicated by the information currently available to WAP. These violations are ongoing. WAP intends to sue for all violations, including those yet to be uncovered and those committed after the date of this Notice of Intent to Sue.

As described above, Quigg has violated and continues to violate effluent standards and limitations under the CWA (see 33 U.S.C. § 1365(f)) including the terms and conditions of the Permits with respect to operations of, and discharges of stormwater and pollutants from its facility located at or about 1021 River Street, Aberdeen, Washington 98520 as described herein, to the Chehalis River, which flows to Grays Harbor. Quigg has also violated and continues to violate Section 301(a) of the CWA, 33 U.S.C. § 1311(a), by discharging pollutants from its ship building operation to the Chehalis River without a NPDES permit.

Under Section 309(d) of the CWA, 33 U.S.C. § 1319(d), each of the above-described violations subjects the violator to a penalty of up to $37,500 per day for each violation that occurred through November 2, 2015, and $66,712 per day for each violation that occurred thereafter. 40 CFR 19.4. In addition to civil penalties, WAP will seek injunctive relief to prevent further violations under Sections 505(a) and (d) of the CWA, 33 U.S.C. § 1365(a) and (d), and such other relief as is permitted by law. Also, Section 505(d) of the CWA, 33 U.S.C. § 1365(d), permits prevailing parties to recover costs, including attorney's fees.

WAP believes that this NOTICE OF INTENT TO SUE sufficiently states grounds for filing suit. We intend, at the close of the 60-day notice period, or shortly thereafter, to file a citizen suit against Quigg under Section 505(a) of the Clean Water Act for violations.

During the 60-day notice period, we would be willing to discuss effective remedies for the violations addressed in this letter and settlement terms. If you wish to pursue such discussions in the absence of litigation, we suggest that you initiate those discussions within 10 days of receiving this notice so that a meeting can be arranged and so that negotiations may be completed promptly. We do not intend to delay the filing of a complaint if discussions are continuing when the notice period ends.

Sincerely,

SMITH & LOWNEY, PLLC

By: *s/Alyssa Koepfgen*
Alyssa Koepfgen

12

Katelyn Kinn

cc:    Michael Regan, Administrator, U.S. EPA
       Casey Sixkiller, Acting Region 10 Administrator, U.S. EPA
       Laura Watson, Director, Washington Department of Ecology
       Registered Agent, Fairchild Record Search, Ltd. (PO Box 1368, Olympia, WA 98507-1368)